UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KARO BROWN,

                                    Plaintiff,

                                                        Case No. 9:07-CV-1169
v.                                                      (GLS/GHL)

ROBERT OUTHOUSE, et al.,

                                    Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

KARO BROWN, 58105-066
Plaintiff *pro se*
Canaan U.S. Penitentiary
P.O. Box 300
Waymart, Pennsylvania 18472

OFFICE OF FRANK W. MILLER                FRANK W. MILLER, ESQ.
Counsel for Defendants                   MICHAEL J. LIVOLSI, ESQ.
6575 Kirkville Road
East Syracuse, New York 13057

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Karo

Brown alleges that Defendants Robert Outhouse (who at the time of the alleged incident was the

Sheriff of Cayuga County), Deputy Scott Walborn of the Cayuga County Jail, and two or more

unnamed officers violated his rights under the United States Constitution and New York state

law by using excessive force on him, denying him prompt medical care, and conducting a

procedurally flawed disciplinary hearing[1].  Currently pending before the Court is Defendants'

motion for summary judgment.  (Dkt. No. 39.)  For the reasons that follow, I recommend that

Defendants' motion be granted.

## I.   FACTUAL AND PROCEDURAL HISTORY

In 2004, Plaintiff was detained at Cayuga County Jail pending trial on federal charges.[2]

(Dkt. No. 1 at ¶ 5.)  Cayuga County Jail has a rule prohibiting the harboring of food.  (Dkt. No.

39-5 ¶ 6.)  This rule is set out in the inmate handbook, which Plaintiff received prior to

November 15, 2004.  *Id.*

On November 15, 2004, Defendant Custody Deputy Scott Walborn was "made aware that

[Plaintiff] had been recorded by security cameras hiding objects under the table at which he was

eating lunch."  (Dkt. No. 39-4 ¶ 4.)  Along with several other officers, he entered the lunch room

to investigate.  *Id.*  Defendant Walborn ordered Plaintiff to pack up his lunch tray and prepare to

be removed from the area.  (Dkt. No. 39-4 ¶ 5.)  Defendant Walborn then investigated the table

where Plaintiff had been sitting and discovered salt and pepper packets in the cracks underneath

the table.  (Dkt. No. 39-4 ¶ 6.)[3]

---

[1]      Plaintiff also named former United States Attorney General Alberto Gonzalez and
Director of the Bureau of Prisons Harley G. Lappin as defendants.  (Dkt. No. 1.)  This Court *sua
sponte* dismissed those defendants upon initial review of the complaint.  (Dkt. No. 5.)

[2]      Defendants assert, without citation to evidence, that Plaintiff was "a convicted
inmate at the time of the incident."  (Dkt. No. 39-8 at 3.)

[3]      Plaintiff admits that he was hiding salt packets.  At his deposition, Plaintiff was
asked if he knew why Defendant Walborn asked him to leave the lunch room.  Plaintiff testified
that "I guess it was putting salt packages under the table, 'cause that's what I was doing."  (Dkt.
No. 39-2 at 19:3-6.)  Plaintiff testified that at the time of the incident he was not aware that there
was a policy against putting salt under the table.  (Dkt. No. 39-2 at 19:17-21.)  He was aware of a
rule prohibiting inmates from taking food to their cells, which was why he stuck the salt in the

Defendant Walborn declares that Plaintiff "became verbally combative and turned toward me in a manner that I perceived as hostile." (Dkt. No. 39-4 ¶ 7.) According to Defendant Walborn, Plaintiff said "you don't mean shit to me . . . you can't do nothing to me . . . fuck you." (Dkt. No. 39-4 ¶ 8.) Defendant Walborn declares that Plaintiff was carrying a plastic food tray in his right hand and that he gripped and brandished an unidentified object in his left hand. (Dkt. No. 39-4 ¶ 9.) Defendant Walborn "decided that the situation called for restraining [Plaintiff] for his safety and the safety of the other officers." (Dkt. No. 39-4 ¶ 10.) Defendant Walborn declares that he "approached [Plaintiff] from behind and grabbed his left wrist. I then leaned him forward onto the lunch tray cart to apply handcuffs. However, the wheeled lunch tray cart rolled several feet[4] into the wall ahead. The cart approached the wall in a slow and steady manner, and at no point was [Plaintiff] thrown or shoved into the wall." (Dkt. No. 39-4 ¶ 11.) Defendant Walborn declares that "[a]fter the cart stopped rolling, using minimal force I put [Plaintiff] on the ground, rolled him onto his chest, and applied handcuffs." (Dkt. No. 39-4 ¶ 12.) As he was handcuffing Plaintiff, he determined that the object in Plaintiff's left hand was an eating utensil. (Dkt. No. 39-4 ¶ 14.) After Plaintiff was handcuffed, Plaintiff "rose to his feet" and was escorted away from the area. (Dkt. No. 39-4 ¶ 17.) As he was being moved, Plaintiff "continued to make verbal threats" against Defendant Walborn and the other officers, such as "I will get you all." (Dkt. No. 39-4 ¶ 18.)

Defendant Walborn declares that he never physically struck or kicked Plaintiff, pushed

---

table rather than taking it to his cell. (Dkt. No. 39-2 at 20:14-15.)

[4]     In a memorandum written on the day of the incident, Sgt. Morgan Radell estimated that the cart rolled ten or fifteen feet. (Dkt. No. 39-5 at 9.)

3

his face into the wall, or injured his lip.  (Dkt. No. 39-4 ¶¶ 15, 19.)  Lt. John Mack, who observed the incident contemporaneously on a security camera, declares that he did not "witness any injury or force used against [Plaintiff] other than that which was necessary to accomplish placing handcuffs on him.  At no time did I witness any other corrections officer push [Plaintiff]'s face into the wall or injure him in any way."  (Dkt. No. 39-5 ¶ 8.)

Plaintiff's version of the events is quite different.  He denies confronting Defendant Walborn or showing any signs of aggression.  (Dkt. No. 43 at 3.)  He testified at his deposition that Defendant Walborn "slammed" him into the cart once,  "slammed" him onto the floor once, and then placed him against the wall so hard that he banged his head and "busted" his lip.  (Dkt. No. 39-2 at 30:7-23.)

Defendants have submitted security video of the incident.[5]  This video, which does not have audio, does not fully support either party's description of the incident.  The video shows that Plaintiff had packed up his tray before Defendant Walborn approached,  placing his trash and remaining food on a bottom tray and then covering it with another tray.  He did not, however, place his brightly colored eating utensil on the bottom tray.  Rather, he placed it on the table to the right of his tray.  He then stood up and drank some milk.  He was walking away from the

---

[5]     On April 21, 2010, Defendants sought permission to file a copy of the video evidence.  (Dkt. No. 44.)  On April 26, 2010, I granted Defendants' request, noting that the Court would determine at a later date whether or not the proffered video constituted admissible evidence.  (Dkt. No. 45.)  On April 28, 2010, Defendants submitted the video, supported by a declaration from Lt. Mack, the custodian of records at Cayuga County Jail, regarding its admissibility as a business record.  (Dkt. No. 46.)   On June 1, 2010, Plaintiff filed objections to the Affidavit of John Mack.  (Dkt. No. 49.)  Plaintiff argues that Lt. Mack's affidavit is not based on personal knowledge.  (Dkt. No. 49 at 1-2.)  I recommend that the Court, for the purposes of this motion, overrule Plaintiff's objections and find the video evidence admissible pursuant to Federal Rule of Evidence 901.

table with the tray in his left hand and the eating utensil on top of the tray when Defendant

Walborn approached.  Defendant Walborn pointed in the direction of the tray cart and then

proceeded to check under the table where Plaintiff had been sitting.  Plaintiff, meanwhile,

continued in the direction of the tray cart.  He looked over his shoulder in Defendant Walborn's

direction three times, apparently saying something to Defendant Walborn each time.  The second

time he looked and spoke, he transferred the tray to his right hand and the eating utensil from the

top of the tray to his left hand.  Although Lt. Mack declares that this constituted "brandishing"

the eating utensil (Dkt. No. 46-1 ¶ 4), a reasonable juror could conclude that this characterization

is not apt.[6]  Plaintiff did not at any point stop moving toward the tray cart or turn his body in

Defendant Walborn's direction.  Immediately after the third time Plaintiff turned his head to look

at him, Defendant Walborn approached Plaintiff from behind and bent him forward onto the tray

cart.  The cart moved forward several feet into a wall, sending Plaintiff's head into the wall.

When the cart moved, Plaintiff was leaning forward onto the cart with Defendant Walborn's right

hand on his neck and Defendant Walborn's left hand on his left shoulder.  Defendant Walborn

took several stutter steps when the cart first moved rather than maintaining a smooth walking

flow as one would expect if he intended to move the cart.[7]  When the cart came to a rest,

---

[6]     Indeed, it appears that no one present at the time of the incident believed at the
time that Plaintiff was "brandishing" a utensil.  As discussed further below, none of the reports
written on the day of the incident mention that Plaintiff was holding, much less "brandishing," a
utensil.

[7]     According to a memorandum written by Lt. Mack, Defendant Walborn told Lt.
Mack after the incident that he thought he may have pulled some muscles or injured his back.  He
received chiropractic care and was excused from work for at least two days to recuperate from
strained back muscles.  (Dkt. No. 43 at 31.)  This fact also supports Defendant Walborn's
contention that he did not intend to move the cart.

Defendant Walborn and several officers moved Plaintiff to the floor, restrained him, and then pulled him to his feet again.  The entire incident, from Defendant Walborn's first physical contact with Plaintiff to the time that Plaintiff was raised to his feet, lasted less than fifty seconds.

Lt. Mack escorted Plaintiff to segregated housing ("the RHU").  (Dkt. No. 39-4 ¶ 20.)  Lt. Mack declares that when he assumed custody of Plaintiff to escort him to the RHU, he "noticed no injury to his person" and did not "observe him to be in any pain or to be experiencing any significant discomfort."  (Dkt. No. 39-5 ¶ 9.)

Plaintiff alleges that he "did not eat any food while he was in solitary confinement because he had requested . . .  medical attention."  (Dkt. No. 1 at ¶ 20.)  Plaintiff alleges that he did not receive any medical attention until two or three days later.  (Dkt. No. 1 at ¶ 20.)  However, Jackie Chadwick, a registered nurse employed at the Cayuga County Jail, declares that she personally examined Plaintiff at sick call on the day after the incident.  (Dkt. No. 39-3 ¶ 4.)  Plaintiff's medical records from the Cayuga County Jail support Nurse Chadwick's assertion.  Plaintiff told Nurse Chadwick that he had been in an altercation with corrections officers on the previous day and that he had injuries to his left shoulder, right jaw area, the right side of his neck, and the back of his neck.  (Dkt. No. 39-3 ¶¶ 5-6.)  Upon examination, Nurse Chadwick noted a "small abrasion" above Plaintiff's right eye, a "very small scratch" on Plaintiff's right wrist, a "small scratch" on Plaintiff's left upper inner arm, and a "small scratch" on the back of Plaintiff's neck.  (Dkt. No. 39-3 ¶ 7.)  There was "minimal swelling" to Plaintiff's left jaw, just below his ear.  There were no cuts, scrapes, or bruises in that area.  (Dkt. No. 39-3 ¶ 9.)  There was no obvious trauma, injury, or deformity to Plaintiff's left shoulder and no evidence of swelling or

bruising.  (Dkt. No. 39-3 ¶ 8.)  Nurse Chadwick did not report any injury to Plaintiff's lip.  Nurse

Chadwick concluded that Plaintiff required only observation, not treatment.  (Dkt. No. 39-3 ¶

11.)

On December 14, 2004, Plaintiff was brought to the infirmary complaining of a

dislocated left shoulder.  (Dkt. No. 39-3 ¶ 13.)  He said this had occurred due to contact with a

metal cart.  *Id*.  Upon examination, the doctor found that Plaintiff's left shoulder exhibited full

range of movement.  *Id*.  The doctor prescribed Advil as needed for discomfort.  *Id*.  Based upon

her review of Plaintiff's medical file, Nurse Chadwick declares that Plaintiff "had no further

medical complaints between December 14, 2004, and his transfer out of [Cayuga County Jail] the

following year."  (Dkt. No. 39-3 ¶ 14.)

As a result of the incident, Defendant Walborn issued a misbehavior report charging

Plaintiff with failing to follow orders, physically and verbally obstructing or interfering with

staff, storing or hoarding food, and making threats to staff.  (Dkt. No. 39-4 at 7.)  As Plaintiff

notes in his opposition (Dkt. No. 43 at 4), although the misbehavior report written on the day of

the incident states that Plaintiff had "a lunch tray in his hand," it does not mention that Plaintiff

was holding an eating utensil in his left hand.  *Id*.  It was not until he prepared an incident report

two weeks later that Defendant Walborn mentioned the eating utensil.  (Dkt. No. 39-4 at 9.)

Indeed, no report prepared on the day of the incident mentions the utensil. (Dkt. No. 39-5 at 9

(Radell report); Dkt. No. 39-5 at 15 (Purcell report); Dkt. No. 39-5 at 11 (Campanello report).)

However, several of the reports written two weeks later do mention the utensil.  (Dkt. No. 39-5 at

12 (Babcock report); Dkt. No. 39-5 at 18 (Gleason report).)

Sometime after Defendant Walborn filed the misbehavior report, Plaintiff was "required

to appear at a disciplinary hearing without any prior notice of the disciplinary hearing." (Dkt. No. 1 at ¶ 14.)  At the hearing, Plaintiff asked to call other prisoners to testify as eyewitnesses, but the hearing officer denied the request. (Dkt. No. 1 at ¶ 22-23.)  Plaintiff was then "kept in solitary confinement status for a couple of months." (Dkt. No. 1 at ¶ 23.)  In his opposition to the motion for summary judgment, Plaintiff states that he was in solitary confinement for sixty to ninety days. (Dkt. No. 43 at 8.)  The record does not include any other information about Plaintiff's disciplinary hearing and subsequent disciplinary confinement.

Plaintiff filed his complaint in this action on November 2, 2007, claiming that Defendants violated his rights under the United States Constitution and New York state law. (Dkt. No. 1 at 1.)  Plaintiff alleges that he still suffers great pain and stiffness and believes that he risks permanent disability in his left shoulder if he is not promptly provided with physical therapy. (Dkt. No. 1 at ¶¶ 27, 29.)  He requests 10 million dollars in damages. (Dkt. No. 1 at 7.)

On January 15, 2009, I recommended that Plaintiff's state law claims be dismissed as barred by the statute of limitations and that Plaintiff's medical care claims against Defendants Walborn and Outhouse be dismissed for lack of personal involvement. (Dkt. No. 21.)  On June 10, 2009, Judge Sharpe adopted my recommendation in part and ordered that Plaintiff's state law claims and the medical care claim against Defendant Walborn be dismissed.  He found, however, that the complaint adequately alleged that Defendant Outhouse was personally involved in the alleged denial of medical care and therefore ordered that the claim survive Defendants' motion to dismiss. (Dkt. No. 27.)

Thus, the following claims proceeded to discovery: (1) an excessive force claim against Defendant Walborn; (2) a procedural due process claim against Defendant Walborn; and (3) a

medical care claim against Defendant Outhouse.  Discovery closed on November 12, 2009.  (Dkt. No. 36.)

On January 11, 2010, Defendants moved for summary judgment of the remaining claims. (Dkt. No. 39.)  On February 10, 2010, Plaintiff requested, and I granted, an extension of time in which to respond to the motion.  Plaintiff's extension request did not mention a need for further discovery.  (Dkt. No. 40.)  On March 1, 2010, Plaintiff wrote to the Court seeking assistance with obtaining discovery from Defendants in order to oppose the motion for summary judgment. Specifically, Plaintiff requested an order directing the warden of U.S.P. Canaan to take pictures of his shoulder, an order directing the psychology department to release Plaintiff's records, and an order directing the medical department to give Plaintiff copies of his medical records.  (Dkt. No. 42.)  On March 12, 2010, I issued an order directing Plaintiff to respond to four portions of Defendants' motion for summary judgment without receiving further discovery: (1) the argument that Plaintiff failed to exhaust his administrative remedies; (2) the argument that there are no triable issues of fact regarding Plaintiff's procedural due process claim; (3) the argument that Defendant Outhouse was not personally involved in any alleged constitutional violation; and (4) the argument that Defendants are entitled to qualified immunity.

On March 25, 2010, Plaintiff filed his opposition papers.  (Dkt. No. 43.)  Plaintiff's opposition responds to all of Defendants' arguments, not simply the four that I directed him to address.  *Id.*

## II.  APPLICABLE LEGAL STANDARDS

### A.   Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).

**B.     Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure

---

[8]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

10

to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009).  However, "the tenet that a court must accept as true all of the allegations

contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*,

129 S. Ct. at 1949.

## III.    ANALYSIS

### A.    Exhaustion of Administrative Remedies

Defendants argue that this action must be dismissed because Plaintiff failed to exhaust his

administrative remedies.  (Dkt. No. 39-8 at 2.)  I find that Plaintiff has raised a triable issue of

fact that Defendants are estopped from asserting this affirmative defense.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under §1983 . . . by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about

prison life, whether they involve general circumstances or particular episodes, and whether they

allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  In

order to properly exhaust administrative remedies under the PLRA, inmates are required to

complete the administrative review process in accordance with the rules applicable to the

particular institution to which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  If a

prisoner fails to properly follow each of the applicable steps prior to commencing litigation, he

has failed to exhaust his administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Here, Plaintiff did not exhaust his administrative remedies regarding his medical care and

due process claims.  The current Sheriff of Cayuga County declares that although Plaintiff filed a

grievance complaining of excessive force, he never filed a grievance complaining that he had

been denied due process or medical treatment.  (Dkt. No. 39-6 ¶¶ 11-14.)  Although the copies of

Plaintiff's grievance that have been submitted to the Court are not entirely legible, this assertion

appears to be accurate.  (Dkt. Nos. 39-5 at 22, 43 at 14.)  In his opposition, Plaintiff admits that

he did not fully exhaust his administrative remedies regarding due process and medical care.

(Dkt. No. 43 at 2.)

Plaintiff's failure to exhaust does not end the inquiry.  The Second Circuit has held that a

three-part inquiry is appropriate where a prisoner has failed to exhaust his available

administrative remedies.  *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).[9]

First, "the court must ask whether [the] administrative remedies [not pursued by the

prisoner] were in fact 'available' to the prisoner."  *Hemphill*, 380 F.3d at 686 (citation omitted).

Second, if those remedies were available, "the court should . . . inquire as to whether [some or all

of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to

raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's]

exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's

failure to exhaust as a defense."  *Id.* (citations omitted).  Third, if the remedies were available and

some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion

defense, "the court should consider whether 'special circumstances' have been plausibly alleged

that justify the prisoner's failure to comply with the administrative procedural requirements."  *Id.*

---

[9]       The Second Circuit has not yet decided whether the *Hemphill* rule has survived
the Supreme Court's decision in *Woodford*, 548 U.S. 81.  *Chavis v. Goord*, No. 07-4787-pr, 2009
U.S. App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).  I will assume
for the purposes of this motion that *Hemphill* remains good law.

(citations and internal quotations omitted).

A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies, and thus estops prison officials from asserting an exhaustion defense.  *Sandlin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008). Here, Plaintiff states that he submitted a grievance form regarding due process and medical care, but that he never received a response.  He "questioned staff about this [g]rievance and was told he had to file another [g]rievance [and] that the only [g]rievance they had on file was the first [g]rievance." (Dkt. No. 43 at 2.)  Plaintiff "then submitted a second [g]rievance form and this [g]rievance never made it to [its] destination."  *Id*.  Plaintiff "then decided that if he filed another [g]rievance it would be lost or destroyed."  *Id*.[10]  Although this bald assertion would be insufficient if he were represented by counsel, I must afford Plaintiff special solicitude as an unrepresented civil rights litigant.  Therefore, I recommend that the Court find that Plaintiff has raised a triable issue of fact that Defendants are estopped from asserting an exhaustion defense.

## B.   Physical Injury Requirement

The Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e), provides that prisoners cannot bring federal civil actions "for mental or emotional injury suffered while in custody without a prior showing of physical injury."  Defendants argue that Plaintiff has not made a prior showing of physical injury, and that therefore his claims should be dismissed.  (Dkt. No. 39-8 at 2-3.)  Defendants' argument is without merit.  The undisputed facts show that Plaintiff suffered abrasions, cuts, and swelling as a result of the incident.  (Dkt. No. 39-3 ¶¶ 7, 9.)  Therefore, I find

---

[10]     None of these statements were made under penalty of perjury.  Rather, they are merely asserted in Plaintiff's opposition brief.

that Plaintiff's claims are not barred by the PLRA's physical injury requirement.

### C.    Excessive Force

Plaintiff claims that Defendant Walborn used excessive force in restraining him.  (Dkt. No. 43 at 3-7.)  Defendants argue that Plaintiff has failed to raise a triable issue of fact because the undisputed evidence shows that Plaintiff suffered only *de minimis* injuries and that Defendant Walborn applied force in a good-faith effort to maintain discipline.  (Dkt. No. 39-8 at 3-8.) Defendants are correct.

As noted above, the complaint alleges that Plaintiff was a pretrial detainee at the time of the incident (Dkt. No. 1 ¶ 5), while Defendants assert without citation to evidence that Plaintiff was "a convicted inmate" (Dkt. No. 39-8 at 3).  Excessive force claims involving pretrial detainees implicate the Fourteenth Amendment, whereas excessive force claims involving convicted inmates implicate the Eighth Amendment.  However, both types of claims are analyzed under the framework of *Hudson v. McMillian*, 503 U.S. 1 (1992).  *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999).  Under that framework, when prison officials are "accused of using excessive physical force. . . the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.  The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantoness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  *Id.* at 7 (citation and quotation marks omitted).

In determining whether the use of force was wanton and unnecessary,

> it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response.  The absence of serious injury is therefore relevant to the . . . inquiry, but does not end it.

*Id.* (citation and quotation marks omitted).  Force may be considered excessive, even where the prisoner does not suffer a serious or significant injury, if the force used is more than *de minimis* or is of a type that is "repugnant to the conscience of mankind."  *Walsh*, 194 F.3d at 48 (quoting *Hudson*, 503 U.S. at 9-10).

Here, upon viewing the video of the incident, no reasonable juror could conclude that Defendant Walborn acted maliciously and sadistically to cause harm.  It is true that the video does not precisely comport with Defendant Walborn's description of the incident.  A reasonable juror might find it noteworthy that the first descriptions of the incident by Defendant Walborn and the other officers did not mention that Plaintiff was holding a utensil in his left hand.  However, even when viewed in the light most favorable to Plaintiff, the evidence shows that Defendant Walborn used no more than *de minimis* force and that the force he used was not of a type repugnant to the conscience of mankind.  The entire incident lasted less than a minute.  Plaintiff admits that he was violating a facility rule.  Defendant Walborn never struck or kicked Plaintiff.  The force lasted only long enough to place handcuffs on Plaintiff and bring him to his feet.  Therefore, I recommend that the Court grant Defendants' motion and dismiss the excessive force claim against Defendant Walborn.

**D.     Procedural Due Process**

Plaintiff claims that his due process rights were violated when he received no prior notice

16

of his disciplinary hearing and the hearing officer refused to allow him to call witnesses.  (Dkt. No. 1 ¶¶ 14, 22-23; Dkt. No. 43 at 8.)  Defendants argue that they are entitled to summary judgment in their favor on this claim because Plaintiff was not deprived of any liberty interest. (Dkt. No. 39-8 at 8-12.)  Defendants are correct.

In order to succeed on a procedural due process claim, a plaintiff must prove that he was deprived of a liberty interest without due process of law.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).  An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier*, 280 F.3d at 80; *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).  Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined" in a segregated housing unit. *Palmer v. Richards*, 364 F.3d 60, 64 n.2 (2d Cir. 2004).  The issue, then, is whether Plaintiff's confinement in the RHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement."  *Palmer*, 364 F.3d at 64 (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).  Where, as here,  a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical

and significant hardship" only if "the conditions were more severe than the normal SHU conditions[11]." *Palmer*, 364 F.3d at 65.

Here, the current Sheriff of Cayuga County and Lt. Mack each declare that conditions in the RHU are "not significantly different from those of the general population. Only three major differences exist in the RHU: inmates' cells are searched on a daily basis; inmates eat inside their cells; and cell doors are transparent rather than barred. All other RHU conditions are similar to the general population. For example, inmates confined to RHU receive the same opportunities for exercise (one hour per day), similar clothing and bedding, similar food, and similar opportunities to wash and bathe. Inmates in RHU are permitted to bathe three days per week. Additionally, cell size is comparable." (Dkt No. 39-5 ¶ 11; Dkt. No. 39-6 ¶ 10.) Plaintiff has not submitted any evidence that contradicts Defendants' version of conditions in the RHU. The conditions described in Defendants' papers are not more severe than normal SHU conditions. Therefore, Plaintiff was not deprived of a liberty interest. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's procedural due process claim.

### E.    Medical Care

Plaintiff alleges that Defendant Outhouse violated his right to adequate medical care.[12] (Dkt. No. 1 ¶ 33.) Defendants argue that this claim should be dismissed because Plaintiff has not

---

[11]    "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

[12]    Any claim that Defendant Walborn violated Plaintiff's right to adequate medical care was dismissed with leave to amend because Plaintiff failed to allege facts plausibly suggesting that Defendant Walborn was personally involved in the alleged violation. (Dkt. No. 27.) Plaintiff did not amend his complaint.

raised a triable issue of fact that his medical condition was sufficiently serious, Defendants were

not deliberately indifferent, and there is no evidence that Defendant Outhouse was personally

involved.  (Dkt. No. 39-8 at 12-16.)  Plaintiff concedes that Defendant Outhouse should "be

removed from suit without prejudice."  (Dkt. No. 43 at 12.)  Even if Plaintiff had not made this

concession, I would find that Plaintiff has failed to raise a triable issue of fact as to his medical

care claim.

There are two elements to a prisoner's claim that prison officials violated his right to

receive adequate medical care: "the plaintiff must show that she or he had a serious medical

condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72

(2d Cir. 2009) (citation and punctuation omitted).[13]  "The objective 'medical need' element

measures the severity of the alleged deprivation, while the subjective 'deliberate indifference'

element ensures that the defendant prison official acted with a sufficiently culpable state of

mind."  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

A "serious medical condition" is "a condition of urgency, one that may produce death,

degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J.

dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994),

*cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Relevant factors to consider when determining whether an alleged medical condition is

sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable

doctor or patient would find important and worthy of comment or treatment; (2) the presence of a

---

[13]     The same standard applies to pretrial detainees' claims under the Fourteenth
Amendment and convicted inmates' claims under the Eighth Amendment.  *Caiozzo*, 581 F.3d at
69-72.

medical condition that significantly affects an individual's daily activities; and (3) the existence

of chronic and substantial pain.  *Chance*, 143 F.3d at 702-03.

Here, Plaintiff's medical records show that Plaintiff suffered a small abrasion over his

right eye, a very small scratch on his right wrist, a small scratch on his left upper inner arm, a

small scratch on the back of his neck, and minimal jaw swelling as a result of the incident.  (Dkt.

No. 39-3 ¶ 7-8.)  Nurse Chadwick did not find these injuries worthy of treatment.  (Dkt. No. 39-3

¶ 11.)  Even if one credits Plaintiff's assertion that his lip was "busted," he has not established

the existence of a serious medical condition.  Courts considering similar injuries have found

them to be insufficiently serious to satisfy the objective prong.  *See Benitez v. Straley*, No.

01-CV-0181, 2006 U.S. Dist. LEXIS 6382, at *8, 10, 33, 2006 WL 5400078, at *3, 4, 12

(S.D.N.Y. Feb. 16, 2006) (cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts" to

plaintiff's wrists-none of which required stitches-did not constitute a medical condition that was

sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were

assumed to be true); *Hickey v. City of New York*, No. 01-CV-6506, 2004 U.S. Dist. LEXIS

23941, at *53-54, 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004) (cuts and bruises do not

constitute sufficiently serious medical needs); *Decayette v. Goord*, No. 06-CV-0783, 2009 U.S.

Dist. LEXIS 48127, at * 3-4,  2009 WL 1606753, at *1 (N.D.N.Y. June 8, 2009) (McAvoy, J.);

*Rodriguez v. Mercado*, No. 00-CV-8588, 2002 U.S. Dist. LEXIS 16057, at *8, 24, 2002 WL

1997885, at *3, 8 (S.D.N.Y. Aug. 28, 2002) (bruises to plaintiff's head, back and wrists,

accompanied by back pain and migraines but no loss of consciousness, did not constitute a

medical condition that was sufficiently serious for purposes of Eighth Amendment).[14]

Even if Plaintiff had sustained a sufficiently serious injury as a result of the incident, I would recommend that his medical care claim be dismissed because he has not raised a triable issue of fact that his condition was met with deliberate indifference.  Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d, 698, 703 (quoting *Hathaway*, 99 F.3d at 553).  Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Chance*, 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need.  *Farmer*, 511 U.S. 825, 835; *Ross v. Giambruno*, 112 F.3d 505 (2d Cir. 1997).  Here, there is no evidence that either Defendant Outhouse or any medical care provider was aware of any facts from which the inference could be drawn that Plaintiff had a serious medical need.  Plaintiff was treated twice in the month after the incident.  At that time, no serious injuries were noted.  Plaintiff's scratches and swelling did not require treatment, and he had full range of motion in his shoulder.  (Dkt. No. 39-3 ¶¶ 11, 13.)  Plaintiff did not seek treatment again while he was confined at Cayuga County

---

[14]       The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Jail.[15]  (Dkt. No. 39-3 ¶ 14.)  Therefore, I recommend that the Court grant Defendants' motion

and dismiss Plaintiff's medical care claim.

####    F.    Doe Defendants

Plaintiff's complaint includes claims against Doe Defendants.  These Does appear to be

the officers who were in the mess hall at the time of the incident and the officer who conducted

Plaintiff's disciplinary hearing.  Plaintiff has never amended his complaint to name these

officers.  Even if Plaintiff had named the officers, he has not raised a triable issue of fact as to

any of his claims, as discussed above.  Therefore, I recommend that the Court dismiss the Doe

Defendants.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be

**GRANTED**; and it is further

**RECOMMENDED** that all claims against the Doe Defendants be dismissed; and it is

further

**ORDERED** that the Clerk provide Plaintiff with copies of *Hickey v. City of New York*,

---

[15]    It appears that Plaintiff may have sought treatment for his shoulder after he transferred out of the Cayuga County Jail.  In a letter to this Court dated February 25, 2010, Plaintiff requested, *inter alia,* an order directing the medical department of his current facility to provide him with copies of his records.  (Dkt. No. 42.)  Plaintiff asserted that these documents were relevant to the summary judgment motion, but did not explain why.  Discovery in this case closed on November 12, 2009.  Although I might exercise discretion to allow Plaintiff, an unrepresented civil rights litigant, to pursue discovery after the discovery cut-off, I decline to do so here.  Plaintiff has not asserted any reason why the records are relevant.  He does not argue, for instance, that these later medical records would raise a triable issue of fact that he suffered injuries so severe that Defendants' failure to note or treat them constituted deliberate indifference.  Defendants state that they have provided Plaintiff with all of the medical records in their possession.  (Dkt. No. 50.)  Therefore, I deny Plaintiff's request.

No. 01-CV-6506, 2004 U.S. Dist. LEXIS 23941, 2004 WL 2724079 (S.D.N.Y. Nov. 29, 2004);

*Decayette v. Goord*, No. 06-CV-0783, 2009 U.S. Dist. LEXIS 48127, 2009 WL 1606753

(N.D.N.Y. June 8, 2009); and *Rodriguez v. Mercado*, No. 00-CV-8588, 2002 U.S. Dist. LEXIS

16057, 2002 WL 1997885 (S.D.N.Y. Aug. 28, 2002) in accordance with the Second Circuit's

decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report. Such objections shall be filed with the Clerk of the

Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a).


Dated: July 9, 2010
      Syracuse, New York

                           George H. Lowe
                           United States Magistrate Judge